IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

MAY TERM, 1881, No. 91.                              JUNE 6TH, 1881.

## Welch's Appeal.

1. Where an executor made a claim against the estate for personal services rendered to the testator, during a period of ten years prior to his death, and the claimant was a son-in-law of the testator in his employ during that period, and in the employ of a firm of which the testator was a principal partner at an adequate salary, and lived in a house of testator without rent, and made no claim for these services during the life of the testator; *Held,* that any presumption that these services were rendered on a promise of payment, express, or implied, was strongly rebutted.

2. An agent in the possession of personal property of his principal, to which the principal had a good title, was sued by a third party upon an alleged promise to pay for the property, which promise he was not authorized to make, and denied having made, and was compelled to pay the judgment recovered against him and the expenses of the suit; *Held,* that he was not entitled to receive this amount from the estate of the principal.

3. An executor who seeks to appropriate the entire estate to his own use by claims for services and otherwise which upon examination prove to be invalid, will not be allowed commissions, and will be charged interest on the moneys in his hands so retained.

4. A creditor having claims against an estate, which he has good reason to believe will be contested, ought not to administer.

APPEAL of Benjamin G. Welch, executor of the estate of William Hancock, deceased, from the decree of the Orphans' Court of *Montour County.*

William Hancock died December 1st, 1872. In his will he appointed James Cousert his executor, and provided that in case of the death of Cousert, Benjamin G. Welch should succeed him as executor. Letters testamentary were

[Welch's Appeal.]

granted to Cousert, who settled his account and died in 1874. Letters were then issued to Welch March 27th, 1875. He filed his account February 24th, 1879, showing receipts to the credit of the estate of $5502.80, and charges against the estate *inter alia* of $1000 to the credit of the executor for services to the testator from 1862 to 1872, and a further sum of $388.73 to the executor for services to the testator during the same period. There was also a claim of the executor for $961.36 to reimburse himself for the payment of a judgment and costs which had been obtained against him by John Stewart, in a suit to October Term, 1872. Exceptions were filed to the account, and an auditor was appointed to pass upon them.

The auditor disallowed all claims for services rendered to the testator more than six years before his death, and awarded to the executor for services within the six years $231.45. He also allowed the claim of $961.36, and the further sum of $275 for commissions.

Exceptions were taken by the legatees under the will of the testator to his report, and the Court below found the facts concerning the claim for services to be as follows:

In 1861 or 1862 Benjamin G. Welch married a daughter of William Hancock, and was shortly after employed by the firm of Hancock & Foley, at the rolling-mill operated by them in Danville. They paid him a salary of one thousand dollars a year, and he attended to the business, and at the same time assisted his father-in-law in matters of business. Mr. Hancock was at that time a partner in a furnace at Harrisburg, doing business as Hancock & Price. The firm of Hancock & Foley had large business transactions with the firm of Hancock & Price. Mr. Hancock also had an interest in ore lands in Canada; also in the Toronto Street Railway, in Canada, which he sold in 1864. He had a lease of a colliery at Pittston, and between 1862 and 1872 was a partner in the firm of Hancock, Creveling & Co., in the iron business, Hancock & Lehnder in milling business; and from 1868 to January, 1872, in partnership with Welch & Curtis, in the colliery at Pittston, as Hancock & Co.; and from 1st September, 1867, to his death, he owned the larger portion of the stock of the National Iron Company, of which Welch was secretary, treasurer, and superintendent. In the meantime Mr. Hancock had a large contract to construct the Crawfordsville and Logansport Railroad. His affairs, after 1867, at one time were in a critical condition by reason of indorsements of the notes of Hopkins to a large amount. In his matters generally Mr. Hancock consulted Mr. Welch, and relied much upon his judgment, and Mr. Welch ren-

dered more or less service to him in his private matters, while he was in receipt of a salary from the firms in which Mr. Hancock was a member and the chief capitalist. If he had any claim for services, all prior to December 1st, 1866, is barred by the statute of limitations. From the 1st day of June, 1866, to September, 1867, Welch was in the employ of Hancock at a salary of one hundred dollars per month. After Foley & Brother left the Pittston colliery, in September or October, 1866, Welch was engaged with E. J. Curtis, as Curtis & Co., in operating the Pittston colliery, down to 1868, when the new lease to Hancock was obtained, and from that time to January, 1872, he was one of the firm of Hancock & Co., operating that colliery. When the National Iron Company was organized, on the 1st of September, 1867, Mr. Hancock was made president, and was owner of the larger part of the stock. He then did for Welch (as he had said to Mr. Deen he would do) as well as he, Welch, could do elsewhere, by electing him secretary, treasurer, and manager of the company, at a salary of five thousand dollars a year, which he continued to enjoy during the life of Mr. Hancock. During the life of the testator no claim appears to have been made upon him for any extra services beyond the salary stipulated for. No charge was made by Welch, although he is a good business man. The claim now set up reaches back nearly eighteen years before the settlement of the account, which is the first notice of its existence. It was not presented to the former executor. It is supported by testimony of a general character as to the services of Mr. Welch. Some of the most important services alleged to have been performed were rendered during the time Mr. Hancock was paying him a salary. Some of them, as claimed, were for the benefit of Mr. Welch himself as a partner, and all of them during the time he was in receipt of a salary undoubtedly received through Mr. Hancock. Up to September, 1867, he resided in a house belonging to Mr. Hancock rent free.

Upon these facts the Court said that " under the evidence hereof, the relationship between the parties, also of the nonclaim for services beyond salary as an accountant while in employ of the testator and of the firm in which he was a principal partner; also of the adequacy of the salary to compensate for all services and of the house rent, I am of opinion that any presumption that the services now claimed for were rendered upon a promise of payment either expressed or implied is strongly rebutted." The exception was sustained, and the entire claim disallowed.

The Court found the facts concerning the claim for $961.36 to be as follows:

In 1863 Mr. Hancock leased a colliery at Pittston. For some time prior to the first day of June, 1866, it was operated by Spering & Foley under a lease from Hancock. After they ceased to work the colliery it was operated by Foley & Brother until September or October of that year. While so operating they purchased a span of horses of John Stewart, which were delivered to them at the colliery by Stewart, he taking the note of Foley & Brother for the price, payable two or three months after date. Before the note came due Foley & Brother failed. They sold out to Hancock, and executed to him a bill of sale, which included the horses bought of Stewart. The consideration does not appear in the evidence. Welch had knowledge of the bill of sale. After Foley & Brother left, the colliery was operated for a time by B. G. Welch & Curtis. Before the Foley note to Stewart became due, Stewart at the colliery demanded the horses of Welch, who refused to give them up, but told Stewart that he would try to influence the father of the Foleys to pay the note. According to the testimony of E. J. Curtis, who was witness to what passed between Stewart and Welch, and according to the testimony of Welch in a suit brought to recover against him, and his declarations before and since, he made no promise to Stewart to pay for the horses or to pay the note of Foley & Brother. The horses were at the colliery when Welch & Curtis, as Curtis & Co., leased and operated the colliery after Foley & Brother left, down to 1868, when the firm of Hancock & Co., consisting of Hancock, Welch & Curtis, was formed, by whom the colliery was operated to January, 1872, about six years after his demand at the colliery for the horses. At October Term, 1872, Stewart brought suit against Welch upon an alleged promise to pay for the horses, and recovered judgment. The amount of the judgment and costs and expenses of securing testimony were equal to the credit claimed by the executor.

Upon this statement of facts the Court said:

" Is the estate of the testator liable to the accountant for any part of that judgment or the expenses of defending the suit? I am of the opinion that it is not. Stewart having sold and delivered the horses to Foley & Brother, could not, under any evidence in this case, have recovered the horses from Foley & Brother. So far as appears, the purchase was a fair transaction. He had no right to repossess the horses because they failed in business. Their sale to Mr. Hancock, so far as appears, was entirely fair. Such being the case, Mr. Welch, as a lessee of the colliery or otherwise, had no

authority to bind Mr. Hancock by a promise that would hold him to purchase the horses again. Nor does it appear that he had any authority either as lessee or agent to bind Mr. Hancock to pay Foley & Brother's debt to Stewart. If, therefore, he made any promise to prevent Stewart from taking the horses himself, or by a writ of replevin, he made it for purposes of his own, and outside of any authority. But the proof here is that he made no promise, either for the benefit of himself or of Mr. Hancock. It is claimed, however, by Mr. Welch, that because the suit against him was based upon an alleged promise by him to pay for Hancock's horses, the misfortune of defeat in the suit must be borne by the estate. There is no evidence that Mr. Hancock, in his life, was ever informed of Stewart's claim. No notice appears to have been given to him, or to his executor, Mr. Cousert, after his death. He was neither party nor privy to the matter at any time, and his estate is not bound by the judgment. The fact that Hancock's estate had the horses does not affect the case. The title of Mr. Hancock was derived by purchase and not by virtue of any promise that Mr. Welch did not make."

The exception was sustained, and the claim disallowed.

Upon the exception to the claim of $275 for commissions, the Court said:

" Compensation is allowed to executors and other trustees for services performed in the discharge of duties in the interest of the estate represented. In this case the accountant has sought to appropriate the entire estate to his own use by claims for services and otherwise, set up to balance the assets received by him. Antagonistic as his claims were to the estate which he represented, he ought not to have administered upon the estate. A creditor who has claims against an estate, which he has good reason to believe will be contested, ought never to take letters of administration. If such a one does take letters, and seeks to appropriate a large portion of the estate to himself upon claims which, upon investigation, prove to be invalid, he will not be allowed commissions upon the assets received by him."

The exception was sustained, and the claim disallowed.

The Court also surcharged the executor with the sum of $240 for interest on the moneys in his hands, and made a decree accordingly.

The executor then took this appeal, assigning as error the sustaining of the exceptions as above set forth and the decree.

*S. P. Wolverton*, for the appellant.

If the appellant performed valuable services to the testa-

tor, which is not denied, he ought to be paid, and the fact
that he was a son-in-law does not preclude his making the
claim: Smith *v.* Milligan, 7 Wr., 107 ; Schoch's Administra-
tor *v.* Garrett, 19 P. F. Smith, 144; Amey's Appeal, 13
Wr., 126.

As to the $961.36 claim : Where a loss is sustained through
agency and without any laches on the agent's part, the prin-
cipal is bound to indemnify him : Story on Agency, §§ 335,
336, 337, 339 ; Ewell's Evans on Agency, p. 473.

It is the right of an agent to be reimbursed all his advances,
expenses, and disbursements made in the course of the agency
on account of, or for the benefit of, the principal when prop-
erly incurred and paid in good faith without default on his
part: Maitland *v.* Martin, 5 Norris, 120 ; Beach *v.* Branch,
57 Ga., 362 ; Searing *v.* Butler, 69 Ill., 575 ; Elliott *v.* Walker,
1 Rawle, 126.

When the act is not manifestly illegal, and one which the
agent does not know to be wrong, the law implies a promise
of indemnity by the principal for all losses and damages
arising from the execution of the agency: Moore *v.* Apple-
ton, 26 Ala., 633 ; Ramsay *v.* Gardner, 11 Johnston, 439 ;
Commonwealth *v.* Vandyke, 57 Pennsylvania State, 34.

He is entitled to indemnity when compelled to pay dam-
age for taking personal property which he has reasonable
ground to believe belongs to his principal : Avery *v.* Halsey,
14 Peck, 174 ; Drummond *v.* Humphreys, 39 Maine, 347 ;
Stone *v.* Hooker, 9 Cowen, 154; Coventry *v.* Barton, 17
John, 142 ; D'Arcy *v.* Lyle, 5 Binney, 441.

As to commissions : It is not a misappropriation of the
moneys of the estate to take credit in his account for any
claims he may have against the estate.   It is the only course
he has to pursue : Souriu's Estate, 32 Leg. In., 40; Myer's
Appeal, 12 P. F. Smith, 104 ; Brennan's Estate, 15 P. F.
Smith, 16 ; Walls's Appeal, 2 Wr., 464.   No reason is given
for charging the account with interest.

*Edward H. Baldy & Son* and *H. M. Hinckley* for the ap-
pellees.

Any presumption of promise on the part of the testator to
pay for the services of Welch is rebutted by the circum-
stances : Smith *v.* Milligan, 7. Wr., 107 ; Amey's Appeal, 13
Wr., 126.

To make the claim for $961.36 come within the principle
established by the authorities cited by plaintiff in error, he
must show a loss to an agent sustained while acting within
the scope of his authority, and arising from the fact of
agency.

[Elizabeth Brubaker's Appeal.]

The Court was right in disallowing commissions: Swartswolter's Account, 4 Watts, 77; Robinett's Appeal, 12 Cascy, 190; Holman's Appeal, 12 Harris, 179; Stehman's Appeal, 5 Barr, 417; Norris's Appeal, 21 P. F. Smith, 126.

PER CURIAM: It would have been more regular if the Court had recommitted the report of the auditor with direction to find and report the facts. The Court, however, determined to act themselves as auditors, and their finding of the facts is certainly entitled to all the weight which an auditor's finding would have had. Upon these facts thus found we are of opinion that the decree was perfectly right, and we affirm this decree upon the opinion of the learned Court.

Decree affirmed, and appeal dismissed at the costs of the appellant.